**2017 UT App 13**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ABISAI MARTINEZ-CASTELLANOS,
Appellant.

Opinion
No. 20130432-CA
Filed January 20, 2017

Fourth District Court, Nephi Department
The Honorable M. James Brady
No. 101600146

Linda M. Jones and Noella A. Sudbury, Attorneys
for Appellant

Sean D. Reyes and Christopher D. Ballard, Attorneys
for Appellee

JUDGE STEPHEN L. ROTH authored this Opinion, in which JUDGE
KATE A. TOOMEY concurred. JUDGE GREGORY K. ORME concurred
in part and concurred in the result in part, with opinion, to
which JUDGE ROTH filed a separate response.

ROTH, Judge:

¶1 Abisai Martinez-Castellanos appeals his convictions for
two counts of possession or use of a controlled substance, Utah
Code Ann. § 58-37-8(2)(b)(ii) (LexisNexis 2012), one count of
possession of drug paraphernalia, *id.* § 58-37a-5, and one count
of driving with a controlled substance in the body, *id.* § 41-6a-517
(2014). Because of the cumulative effect of several errors, our
confidence that Martinez-Castellanos received a fair trial is
undermined. We vacate his convictions and remand for a new
trial.

BACKGROUND[1]

*The Traffic Stop*

¶2      In June 2010, Martinez-Castellanos was driving his car on Interstate 15 in central Utah. From the other side of the interstate where he was completing a traffic stop, a Utah Highway Patrol trooper observed Martinez-Castellanos' car traveling northbound. The trooper got in his patrol car and, without turning off his emergency lights from the prior stop, crossed the median and accelerated to close the distance between himself and Martinez-Castellanos. When he got closer, the trooper saw that Martinez-Castellanos had California license plates and that the rear license plate had only one registration sticker. According to the trooper, California law required two registration stickers on the license plate—one for the month and one for the year.

¶3      When Martinez-Castellanos saw the trooper's patrol car with its emergency lights engaged, he pulled his car over to the side of the road. Martinez-Castellanos provided the trooper with his driver license, registration, and proof of insurance. The trooper took the information to his patrol car and checked it. He also ran a warrants check and a background check for criminal history.

¶4      The trooper learned that, although Martinez-Castellanos had not properly affixed a registration sticker to the license plate, the registration was valid. He also learned that Martinez-Castellanos had miscellaneous theft charges dating back to 1997 and charges for drug offenses in 2001 and 2006, with a probation

---

1. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly. We present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346 (citations and internal quotation marks omitted).

revocation for possession of a controlled substance. The trooper testified that this information, along with Martinez-Castellanos' rapid speech and movements, "heightened" his suspicions that Martinez-Castellanos "might be [under] the influence of something."

¶5    The trooper returned to the car and asked Martinez-Castellanos to step out so that he could conduct field sobriety tests. The trooper also asked if Martinez-Castellanos had any weapons in the car, to which he responded that there were knives in the center console. Based on field sobriety tests, the trooper concluded that Martinez-Castellanos was under the influence of a controlled substance, and based on Martinez-Castellanos' criminal history, the trooper believed that he was a restricted person who could not legally possess knives. The trooper arrested Martinez-Castellanos and searched his car. The trooper found two pocket knives, a marijuana grinder, a lighter, two glass pipes, a wrapper containing three pills that later tested positive for hydrocodone, another wrapper containing a "white, crystal-like substance" that later tested positive for methamphetamine, and a wrapper containing seven prescription pills. Later, at the jail, Martinez-Castellanos admitted the he had smoked marijuana but refused to submit to a urine test. The trooper obtained a warrant for a blood draw, which tested positive for a marijuana metabolite at a level consistent with recent marijuana use.

*The Motion to Suppress*

¶6    Before trial, Martinez-Castellanos' trial counsel moved to suppress the evidence from the car and the blood draw, arguing that the "evidence was seized in violation of [Martinez-Castellanos'] constitutional rights to be free from unreasonable search and seizure." The trial court held an evidentiary hearing on the motion and the trooper testified for the prosecution and was cross-examined by trial counsel. Prior to the hearing, trial counsel had not requested or reviewed the dash-cam video of

the traffic stop. At the end of the hearing, trial counsel requested a copy of the video as well as thirty days to "submit a brief on the matter," and the trial court set a briefing schedule. Trial counsel did not timely file a brief, but about a week after it was due submitted a motion "request[ing] additional time in which to file his brief regarding the suppression of evidence." The court granted the motion but trial counsel again failed to file a brief in support of his motion to suppress. The following month, having received nothing from defendant's trial counsel, the prosecution submitted its own memorandum in opposition to the motion to suppress, to which trial counsel did not respond. The district court eventually ruled on the motion to suppress stating that, "having reviewed testimony given and [the] memorandum provided [by the State], the Motion to Suppress is hereby denied."

¶7    Nearly two weeks later, trial counsel moved to set aside that decision and again requested additional time to file a supporting memorandum. The motion was accompanied by a transcript of the hearing on the motion to suppress. The district court granted the request and gave trial counsel an additional week to file his supporting memorandum. On the due date, trial counsel again failed to file a memorandum in support of the motion to suppress. Instead, counsel filed a motion captioned "Submission of Motion to Suppress," which stated in its entirety,

> Comes now the Defendant by and through his legal counsel and submits the Motion to Suppress Evidence to the Court based upon the transcript of the suppression hearing which has now been completed and provided to the Court and on the Memorandum provided to the Court by . . . [the] Deputy Juab County Attorney.

¶8    The trial court then entered an order reinstating its prior decision explaining that, "having received no memorandum in support of defendant's motion to dismiss by the date authorized,

the Court reinstates its prior order denying defendant's motion to suppress."

¶9      Trial counsel later filed two more motions to suppress the evidence from the traffic stop, one at the beginning of trial and one after trial was complete, again without supporting memoranda. The prosecution opposed those motions as untimely and deficient under the Rules of Criminal Procedure. The trial court ultimately denied both motions.

*Jury Selection and Trial*

¶10     Before trial began, the trial court had a twenty-six member jury venire fill out juror questionnaires. After the questionnaires were completed the trial court asked the venire members additional "yes" or "no" background questions about matters that might influence their attitudes and opinions regarding the case. Before beginning the questioning, the court advised the venire members that it would "not . . . ask you to describe anything in open court right now," but that the attorneys "may . . . want to ask you more questions about that [affirmative answer] later" and that "[w]e'll go into a place where we can have some privacy and discuss it." The trial court then asked approximately ten questions, three of which are pertinent here: (1) whether "you, a family member, or close friend [have] been a victim of a crime"; (2) whether "you, a family member, or close personal friend [have] been involved with the same kind of conduct that is being discussed in this case"; and (3) whether "you[,] . . . a family member[,] or a close personal friend . . . is a law enforcement officer or works for a law enforcement department." After completing these background questions, the court stated,

> Counsel, that concludes the voir dire that I'm going to conduct in court. For members of the prospective jury, I'm going to take a break now and meet with counsel in my chambers, and they

will determine any additional questions that they'd like to ask. They may ask questions of each of you or only some of you. . . . I will be in a brief recess until we come back in, which may be in a few minutes. Counsel, if you'll just join me back in my chambers, I'd appreciate it.

Martinez-Castellanos was not invited into chambers by either the court or his counsel, and he remained in the courtroom while further questioning of individual venire members took place.

¶11    In chambers, the court asked the attorneys if they had questions for any of the individual venire members. The court then individually called those identified into chambers. However, the courtroom microphone was left on during the entire process, rendering the audio recording of the in-chambers questioning unintelligible. Because no transcript or record was available for the portions of the voir dire that occurred in chambers, on appeal Martinez-Castellanos moved this court to supplement the record with declarations from the two attorneys for the prosecution and from Martinez-Castellanos' trial counsel under Rule of Appellate Procedure 11(h). Both parties stipulated to the supplemented record. By its nature—reconstructed out of the memories of participants roughly fifteen months after the fact—the record of the in-chambers voir dire is not fully comprehensive and lacks detail in many areas.

¶12    Based on this reconstructed record, it appears that over the course of approximately one hour, the district court invited thirteen of the twenty-six venire members into chambers for individual questioning. After questions from the attorneys, the court asked each prospective juror "if he or she could be fair and impartial." Once the person had been excused to the courtroom, the court then typically asked whether the attorneys had concerns with that person serving on the jury and whether the attorneys passed the prospective juror for cause, though there is no indication that specific concerns were raised about any

particular venire member or whether any were actually challenged for cause.

¶13    Among the venire members called into chambers were three individuals who would eventually become, for purposes of the trial, Juror One, Juror Two, and Juror Six. Juror One was a retired Utah Highway Patrol trooper and supervisor with extensive experience in drug interdiction on Utah's highways and with whom trial counsel had worked when he was the county attorney. While in chambers, Juror One disclosed that he knew the trooper who had made the traffic stop, but he assured the attorneys and the court that he could be fair, would make up his mind based on the facts, would not give the trooper's testimony any more weight than the other witnesses. Juror Two indicated in chambers that she had been the victim of a violent crime, that she was against drugs, that her son had once been prosecuted for drugs, and that if a person had drugs in the car, he was probably guilty. Juror Six, according to trial counsel, seemed quite reluctant to disclose what was going on in her mind. When the court asked if she could be fair and impartial, Juror Six expressed reservations about her ability to function as a juror. Following up, the court asked her the same question a second time, to which she replied that she understood what the judge wanted and believed she could serve as a juror. There is no indication in the record that any of these three prospective jurors were questioned further or challenged for cause.

¶14    At the conclusion of this process the attorneys returned to the courtroom and exercised their peremptory strikes. Martinez-Castellanos' trial counsel did not discuss what had occurred in chambers with Martinez-Castellanos and exercised his four peremptory strikes without consultation with his client.

¶15 The court announced the names of the eight individuals who would serve on the jury, which included Juror One,[2] Juror Two, and Juror Six. It then asked the prosecution and trial counsel whether the listed individuals "constitute[d] the jury [you] selected." Both answered in the affirmative and the court administered the juror's oath. Following a one-day trial, the jury convicted Martinez-Castellanos of two felonies for possession or use of a controlled substance and two related misdemeanors.

*Post-Trial Proceedings*

¶16 One week after the trial and on its own initiative, the trial court met with counsel for both parties and issued a notice indicating that it was considering granting a new trial. The notice stated that "the court is concerned with a question of whether any error or impropriety occurred in this case which may have had a substantial adverse effect on the rights of the defendant."[3] The court specifically "expressed concern whether [Martinez-Castellanos] received effective assistance of counsel." The court stated that this concern was "based solely on the court's own consideration of two events in the history of this case": trial counsel's "failure to file any memorandum following . . . [the] motion to suppress," and trial counsel's "failure to challenge or remove a potentially biased juror from the jury on the day of trial." Regarding the motion to suppress, the court stated,

---

2. Juror One eventually served as the jury foreman.

3. Rule 24 of the Utah Rules of Criminal Procedure provides, "The court may, upon motion of a party or upon its own initiative, grant a new trial in the interest of justice if there is any error or impropriety which had a substantial adverse effect upon the rights of a party." Utah R. Crim. P. 24(a).

> Without coming to a conclusion on the final issue presented in the motion to suppress, the court notes that based on the testimony elicited at trial, there is at least an arguable basis to have pursued defendant's motion to suppress, which [trial counsel] failed to do.

¶17 Regarding the "potentially biased juror" issue, the court stated that it was "also concerned that a prospective juror who may have a bias was ultimately allowed to remain on the jury to hear and decide the case." The court identified Juror One and stated that its "concern for potential bias" was based on "the juror's many years working as a highway patrolman, his prior involvement in numerous interdiction cases with facts similar to the case being tried, and/or his brief prior association with the State's only witness who is a current highway patrolman."

¶18 In the course of a subsequent hearing on the matter, the court stated that, based on its reading of a recent Utah Court of Appeals decision, it had concluded that "who remain[ed] on the final jury panel [was] not a valid concern."[4] However, the court decided to appoint conflict counsel to represent Martinez-Castellanos in post-trial proceedings regarding the motion to suppress issue.[5] The court described its concerns as:

---

4. The court seems to be referring to *State v. Smith*, 2012 UT App 338, 291 P.3d 869. The court dismissed the part of its original sua sponte motion relating to its concern about potential juror bias, calling it a "non-issue" "[b]ased on [its] review of the appellate court [case]," but did not explain how *Smith* influenced that decision.

5. The court believed conflict counsel was necessary to address questions regarding trial counsel's performance in connection with the original motion to suppress and was concerned that, on

(continued…)

> [W]hether or not the evidence that supported the continued retention of [Martinez-Castellanos] after [the trooper] determined that the vehicle was registered, and that the driver was who he said he was, and that he had a valid driver license, whether there was then at that point justification for having [Martinez-Castellanos] step out of the car and further perform . . . field sobriety tests; [and] whether there was reasonable suspicion.

¶19    Approximately a month later (and just a day before the sentencing hearing), conflict counsel submitted a memorandum entitled "Amicus Brief." The Amicus Brief did not address the extended detention of Martinez-Castellanos nor analyze the evidence obtained following the traffic stop or applicable law, as the court had requested. Instead, conflict counsel wrote in the Amicus Brief, "The issue presented to this Court and the catalyst for this Amicus Brief, is succinctly stated as: Whether [Martinez-Castellanos'] failure to file a legal memorandum in support of his Motion to Suppress rises to the level of ineffective assistance of counsel." Conflict counsel went on to discuss the two-part *Strickland* analysis for ineffective assistance of counsel as it applied to the burdens of the parties in briefing suppression issues. The Amicus Brief concluded that the district court's earlier denial of the motion to suppress was sufficient to include "an implicit determination that the facts elicited at the evidentiary hearing" supported a lawful search, essentially advising the court that its decision denying the motion to suppress had addressed the issues. The Amicus Brief made no effort to advocate for a different result on Martinez-Castellanos'

---

(…continued)

the issue of "what was done" and "why it was done," "the best source of that information may be [trial counsel]," who might be required to testify on those issues.

behalf, nor did conflict counsel address the trial court's concern about whether the evidence adduced at trial was pertinent to the suppression issue.

¶20 At a subsequent hearing, the court again raised its concern regarding "whether or not there was a justification for extending the time" of the traffic stop and the evidence obtained following the stop. The court stated that it understood conflict counsel's conclusion:

> [B]ecause . . . a motion to suppress evidence was presented [to the court], that motion shift[ed] the burden to the State to prove their case to a certain standard why the evidence should not be suppressed, and that the State presented evidence at the time of a hearing, and that [the court] ruled on that evidence, and that [the court] had denied the motion to suppress. Independent from whether or not [trial counsel] filed an argument there, the fact that he filed the motion would have been sufficient to place the burden on the State to prove that the motion to suppress should be denied. . . . [And] it did not appear to [conflict counsel] that [the court] would find an injustice or an impropriety in the proceedings or the rulings that were made that could be attributed to the defendant's attorney at the time.

¶21 The prosecution responded that it concurred with the findings of conflict counsel in Amicus Brief. Conflict counsel also agreed with the court's statement. Conflict counsel then provided one alternative suggestion for the court to consider, specifically that Martinez-Castellanos could renew his motion to suppress or make a motion for a new trial if there were significant or substantial discrepancies between the evidence offered at the evidentiary hearing and that offered at trial. But, ultimately, conflict counsel concluded that this alternative path

would be premature at this point in time. The court then decided that, "[b]ased on the information and arguments that have been presented," it would withdraw its sua sponte motion because it considered the issue resolved.

¶22    At that point, the court released conflict counsel from his representation of Martinez-Castellanos and reinstated trial counsel, who affirmed that he was "prepared to go forward . . . with sentencing." Martinez-Castellanos was sentenced to serve zero to five years in the Utah State Prison. The court suspended the sentences and placed Martinez-Castellanos on probation.

¶23    Trial counsel then filed a timely motion for a new trial, again asking the court to suppress the evidence from the initial traffic stop. Trial counsel argued that the "best proof" for his motion was the district court's own "concern that was expressed by the Court in its Memorandums and the fact that all of the evidence upon which reliance is made was not fully developed until the time of the trial." Once again, trial counsel filed no memorandum in support of this motion but simply attached the transcripts of the preliminary hearing, the suppression hearing, and the trooper's trial testimony. In the motion, trial counsel asserted,

> [I]n the areas marked out in these transcripts, there is a substantial change of the officer's testimony regarding the reason for the stop and the time and delay in the stop. That was not fully explained until the time of trial. Thus, the prior Order of the Court denying the Motion to Suppress should be set aside and reconsidered because of the new testimony that was offered at trial.

¶24    Counsel did not further analyze the issue. The prosecution opposed trial counsel's motion as untimely and inadequate, and the trial court denied the motion without explanation. Martinez-Castellanos appeals his convictions.

ISSUES AND STANDARDS OF REVIEW

¶25   With the assistance of new counsel, Martinez-Castellanos raises several issues that he acknowledges were not preserved in the trial court and must therefore be considered under principles of plain error or ineffective assistance of counsel. His first two issues relate to jury selection. He asserts that he was "denied the right to participate in the jury-selection process" when he was not given the opportunity to participate in chambers where significant aspects of voir dire took place. He argues that this omission amounts to both ineffective assistance of counsel and plain error on the part of the trial court. He further asserts that his trial counsel "was ineffective for failing to request that [certain] prospective jurors be dismissed for cause and/or failing to remove them with peremptory strikes."

¶26   Martinez-Castellanos next argues that trial counsel's actions with regard to the motions to suppress evidence amounted to ineffective assistance of counsel. Lastly Martinez-Castellanos argues that "the district court erred in failing to ensure that [he] had the effective assistance of counsel at all stages of the proceedings, including during post-trial proceedings."

¶27   "It is a well-established rule that a defendant who fails to bring an issue before the trial court is generally barred from raising it for the first time on appeal." *State v. Irwin*, 924 P.2d 5, 7 (Utah Ct. App. 1996). Because Martinez-Castellanos' arguments were not preserved below and are raised for the first time on appeal, we will only address the issues if they meet an "exception[] to this general rule." *Id.*; *see also State v. Floyd*, 2014 UT App 53, ¶ 6, 321 P.3d 1170 (listing the recognized exceptions as "plain error, exceptional circumstances, or ineffective assistance of counsel"). Martinez-Castellanos asserts both the plain error and ineffective assistance of counsel exceptions.

¶28    To succeed on his plain error claim, Martinez-Castellanos "must demonstrate that an error occurred, the error was or should have been obvious, and the error was prejudicial." *State v. Moore*, 2012 UT App 227, ¶ 5, 285 P.3d 809. "If any one of these requirements is not met, plain error is not established." *State v. Dunn*, 850 P.2d 1201, 1209 (Utah 1993). To establish his claim of ineffective assistance of counsel, Martinez-Castellanos "must show that [his] counsel's performance was deficient" and that "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In other words, Martinez-Castellanos must show that the errors were "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.


ANALYSIS

¶29    We first address Martinez-Castellanos' claim that the assistance provided by his trial counsel during jury selection fell below the level guaranteed by the Sixth Amendment. We then address the claim that trial counsel was ineffective in connection with the motion to suppress and related post-trial proceedings. We also consider whether the trial court plainly erred by "fail[ing] to appoint counsel" to represent Martinez-Castellanos during the court's sua sponte post-trial motion, instead "simply appoint[ing] an attorney as amicus to address one distinct issue for the court."

¶30    Finally, we discuss the cumulative error doctrine. We conclude that, although the prejudice from any single error is elusive when viewed solely through the doctrines of plain error and ineffective assistance of counsel, "the cumulative effect of the several errors undermines our confidence that a fair trial was had." *Cf. State v. Dunn*, 850 P.2d 1201, 1229 (Utah 1993) (ellipsis, citation, and internal quotation marks omitted). We therefore vacate Martinez-Castellanos' convictions and remand for a new trial.

## I. Voir Dire

¶31    Martinez-Castellanos argues that he "was denied the opportunity to participate in jury selection and was denied the right to an impartial jury." Martinez-Castellanos asserts that he "was deprived of those rights when [trial counsel] failed to object to the district court's order excluding him from participating in jury voir dire in-chambers" and failed to consult with him during the course of jury selection. In particular, Martinez-Castellanos argues that because he "was not allowed to participate" during the in-chambers questioning of prospective jurors, he was "denied the opportunity to be present at a critical stage" of his trial.

¶32    We do not resolve the question of whether, as a general matter, voir dire is a critical stage of trial at which a defendant has a constitutional right to be present at all times. Instead, we conclude that the in-chambers voir dire in this case was sufficiently important that counsel's failure to provide Martinez-Castellanos a meaningful opportunity to participate in the process—either through physical presence in chambers or at minimum through consultation afterward—amounted to deficient performance.[6]

¶33    "One of the most basic of the rights guaranteed by the Confrontation Clause [of the Sixth Amendment] is the accused's right to be present in the courtroom at every stage of his trial." *Illinois v. Allen*, 397 U.S. 337, 338 (1970). "[E]ven in situations

---

6. We recognize that there are circumstances where having the defendant in chambers may not be feasible, but a trial court has other options, such as conducting this sort of individualized voir dire in the courtroom with the other jurors excused. *See, e.g.*, *United States v. Washington*, 705 F.2d 489, 497 n.4 (D.C. Cir. 1983) (discussing the "use of closed circuit television" as one possible alternative).

where the defendant is not actually confronting witnesses or evidence against him, he has a due process right to be present in his own person whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge." *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987) (citation and internal quotation marks omitted). In discussing this privilege, the United States Supreme Court has stated,

> Although . . . this privilege of presence is not guaranteed when presence would be useless, or the benefit but a shadow, due process clearly requires that a defendant be allowed to be present to the extent that a fair and just hearing would be thwarted by his absence. Thus, a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure.

*Id.* (citations and internal quotation marks omitted). In this regard, "[t]he Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense." *Faretta v. California*, 422 U.S. 806, 819 (1975).

¶34     In particular, the defendant's presence at trial is central to the implementation of the right to trial by jury and the right to confrontation. This longstanding right to be present at trial reflects "the notion that a fair trial [can] take place only if the jurors [meet] the defendant face-to-face and only if those testifying against the defendant [do] so in his presence." *Crosby v. United States*, 506 U.S. 255, 259 (1993). "Voir dire plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored." *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (plurality opinion).

¶35 The Supreme Court has noted that, if "the indictment is for a felony, the trial commences at least from the time when the work of empanelling the jury begins." *Gomez v. United States*, 490 U.S. 858, 873 (1989) (citation and internal quotation marks omitted). "The selection of particular jurors . . . arguably has a reasonably substantial relation to the fullness of a defendant's opportunity to defend against a charge, and a defendant's right to a fair and just hearing could be thwarted by his or her absence." *State v. Hubbard*, 2002 UT 45, ¶ 33 n.7, 48 P.3d 953; *see also Stincer*, 482 U.S. at 745 ("[A] defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure.").

¶36 The Utah Supreme Court has not yet decided the issue of whether "discussions between the court and prospective jurors" is a critical stage of trial at which a defendant is "guarantee[d] a right to be present." *Hubbard*, 2002 UT 45, ¶ 33.[7] But the court has acknowledged the importance of "the voir dire process . . . as a means to unearth and assess any possible bias and prejudice in potential jurors," *State v. Shipp*, 2005 UT 35, ¶ 14, 116 P.3d 317, and the importance of the voir dire process to the fairness of a trial and the legitimacy of its outcome cannot be disputed. The information gathered in voir dire is essential to the informed decision-making that must underlie challenges to individual jurors for cause or the intelligent exercise of peremptory challenges. It is the heart of the process that trial courts use to ensure that a defendant is tried by a jury which is as fair and

---

7. The parties each discuss the issue of whether voir dire is a critical stage of trial at which a defendant has a right to be present and whether this right was waived here. We do not reach those questions because we resolve Martinez-Castellanos' appeal on other grounds.

impartial as possible under the circumstances, given the makeup of the venire.

¶37 The Idaho Supreme Court has explained the importance of the defendant's presence during the voir dire process:

> The defendant may wish to challenge a particular prospective juror for any one of several valid reasons, one of which may be a negative visceral reaction. That is his long recognized privilege and one which is important to the trial process. In *Snyder v. Commonwealth of Massachusetts*, 291 U.S. 97 (1934), the general test for determining when a defendant's personal presence is required is stated as follows:
>
> > [W]henever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge. Again, defense may be made easier if the accused is permitted to be present at the examination of jurors or the summing up of counsel, for it will be in his power, if present, to give advice or suggestion or even to supersede his lawyers altogether and conduct the trial himself.
>
> We add that an important aspect of any trial is its openness and fairness. The purpose of having an accused present is to insure that he has first hand knowledge of the actions taken which lead to the eventual outcome of the trial and particularly that he knows how the jurors who decide the facts were selected. Where part of the court proceedings are held outside his presence, an accused will automatically be suspicious.

*State v. Carver*, 496 P.2d 676, 679 (Idaho 1972) (ellipses and citation omitted).

¶38    Thus, it was important for Martinez-Castellanos to at least have the opportunity to be present at and participate in the jury selection process. *See Hubbard*, 2002 UT 45, ¶ 33 n.7; *see also Gomez*, 490 U.S. at 873 ("Jury selection is the primary means by which a court may enforce a defendant's right to be tried by a jury free from ethnic, racial, or political prejudice, or predisposition about the defendant's culpability." (citations omitted)). But while he was present for the initial questioning of prospective jurors in open court, he was not present in chambers for nearly an hour of follow-up questioning by the court and counsel.

¶39    Critically, the questioning of these prospective jurors in chambers revealed significant information about three members of the jury venire who later served as jurors in the case. As a consequence, Martinez-Castellanos did not have the opportunity to appropriately consult with trial counsel during what was the heart of the juror-selection process of his criminal trial, i.e., the almost one-hour, in-chambers questioning of individual venire members where potential bias and prejudice may have been unearthed.

¶40    The problem appears to have gone further than the defendant's absence from the in-chambers voir dire. Trial counsel stated, "I do not recall that I had any conversations with my client about any part of the jury selection process. He was not in chambers and not involved in the process." Based on trial counsel's own statements, then, Martinez-Castellanos was "not involved in the process."[8]

---

8. The State asserts that "[t]hese statements do not prove that [Martinez-Castellanos] was not invited to participate and had no notice of his right to attend the in-chambers questioning." (Internal quotation marks omitted.) Instead, the State argues that, "[t]rial counsel's inability to recall discussing whether

(continued…)

¶41 "An attorney undoubtedly has a duty to consult with the client regarding 'important decisions,' including questions of overarching defense strategy." *Florida v. Nixon*, 543 U.S. 175, 187 (2004) (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)). "Counsel's function is to assist the defendant," and from this function "derive[s] the overarching duty to advocate the defendant's cause and the more particular duties *to consult with the defendant on important decisions* and to keep the defendant informed of important developments in the course of prosecution." *Strickland*, 466 U.S. at 688 (emphasis added). As we have discussed, one of the most important decisions in any jury trial is the selection of the jury. The questioning of jurors about their associations, backgrounds, and experience is central to the determination of whether individual jurors harbor any attitude or bias that could affect their ability to act fairly in a case.

¶42 Here, the trial judge decided to conduct particularly sensitive aspects of the voir dire process with individual jurors in chambers where their answers would not be inhibited by the public setting of the open courtroom. The court intended to follow up on each venire member's affirmative answers to

---

(…continued)

[Martinez-Castellanos] wished to be present during the in-chambers questioning does not establish that such discussions did not happen." Trial counsel's statement from his affidavit, while couched in the language of an exercise of memory, did not say that he did not remember what happened at all, implying that he just cannot say whether he consulted with Martinez-Castellanos or not. Rather, his statement is more reasonably read to say that he had a memory of the events which did not include any discussion with Martinez-Castellanos. And given the nature of his representation with respect to the motion to suppress, we are reluctant to interpret any lingering ambiguity in this statement in the way the State suggests.

questions important to the prospective juror's ability to be fair and impartial in this particular case, such as prior experience as a crime victim, involvement with similar crimes, and prior association with law enforcement. The nature of a potential juror's answers to such questions—both in terms of substance and demeanor—is crucial to the determination of whether to challenge a particular venire member for cause or later eliminate him or her through the exercise of a preemptory strike. Admittedly, this sort of judgment is generally most informed by the experience and wisdom of counsel. But the importance of a defendant's ability to consult with counsel during such a process and the effect on the defendant's own perception of whether the process has been fair cannot be discounted. *Strickland*, 466 U.S. at 688 ("From counsel's function as assistant to the defendant derive the overarching duty to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution."). This is especially true when statements by individual venire members during individual questioning raise concerns about their ability to sit as jurors in a case, as happened here. *Cf. State v. Calliham*, 2002 UT 86, ¶ 49, 55 P.3d 573 ("When a potential juror makes statements that raise a question about her ability to be impartial, the trial court must either excuse her or further question her . . . and determine whether she could act impartially." (citation and internal quotation marks omitted)).

¶43    The trial court invited thirteen prospective jurors into chambers where trial counsel, the prosecution, and the court had the opportunity to question each of them individually for the purpose of privately discussing any of their affirmative answers to questions that may have had an effect on their ability to act impartially. At least three of those who later decided Martinez-Castellanos' guilt revealed information in chambers—but out of eyesight and earshot of Martinez-Castellanos—that raise significant concerns about partiality.

¶44    For instance, Juror Two indicated in chambers that she was against drugs, that her son had once been prosecuted for drugs, and that if a person had drugs in the car, that person was probably guilty. Likewise, Juror One revealed important information for the first time in chambers that he did not disclose on his juror questionnaire or during the general questioning in open court.[9] Thus, Martinez-Castellanos never learned that Juror One was a retired Utah Highway Patrol trooper and former drug interdiction supervisor with decades of experience performing work much like that at issue here. Additional in-chambers questioning uncovered that Juror One knew the trooper—the State's only witness—in a professional capacity at one point. Finally, Juror Six raised substantial concerns when, according to trial counsel, she appeared reluctant to disclose her thoughts and when she expressed "reservations about her ability to function as a juror." Although she went on to say that she understood what the judge wanted and believed she could serve as a juror, her contradictory statements could not have dispelled concern of bias on their own. *See State v. Saunders*, 1999 UT 59, ¶ 35, 992 P.2d 951

---

9. On his questionnaire, Juror One provided only the following responses:

> Question: "Where do you work and what is your job title?"
>
> Answer: "Retired"
>
> Question: "In what business or occupation have you spent the longest period?"
>
> Answer: [left blank]
>
> Question: "Have you, any member of your family, or a close friend ever been employed by any law enforcement agency?"
>
> Answer: "yes"

(explaining that "[r]uling that a prospective juror is qualified to sit simply because he says he will be fair ignores the common-sense psychological and legal reality of the situation").

¶45    And while it seems unlikely that responses such as these would not prompt further questioning from the judge and counsel, if not challenges for cause, the reconstructed record does not disclose any follow-up other than the judge's simple inquiry whether each juror could be fair and impartial.

¶46    But even if a more complete record may have mitigated the concerns regarding each juror's ability to serve, trial counsel still failed to ensure that Martinez-Castellanos was able to either observe this vital process or participate in any meaningful way. Trial counsel's concession that he did not have "any conversations" with Martinez-Castellanos concerning jury selection and that Martinez-Castellanos was "not involved in the process" means that he neither advised Martinez-Castellanos about what had occurred in chambers with respect to the three venire members of concern nor consulted with him during the exercise of peremptory challenges. As we have discussed, "[r]epresentation of a criminal defendant entails certain basic duties." *Strickland*, 466 U.S. at 688. Among them are "to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution." *Id.* It seems clear enough that where potential jurors express concerns implicating impartiality, this information should not only have been shared with Martinez-Castellanos, but he should have been afforded the opportunity to consult with trial counsel and express his opinion, if any, on whether Juror One, Juror Two, or Juror Six should be empaneled.

¶47    In assessing an ineffective assistance claim, however, we "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered

sound trial strategy." *Id.* at 689 (citation and internal quotation marks omitted). There might be a good reason for a defendant to avoid an in-chambers voir dire process; for example, if counsel judged that the benefits of the client's presence might be outweighed by the risk that potential jurors might be put off by the defendant's appearance or demeanor. But here trial counsel gave no such explanation and did not even consult with his client regarding the decision. And however experienced counsel may have been, it is difficult to conceive of a plausible reason to completely isolate Martinez-Castellanos from any consultation or participation in the grit of the jury selection process; there is no apparent risk and much to gain in terms of the fairness and effectiveness of the process.

¶48    In particular, it is difficult to understand why trial counsel would not have discussed in some detail the concerns raised by questioning of the three jurors in chambers. Counsel should have at least consulted with Martinez-Castellanos about his ability to be present during the chambers voir dire and then, after it was over, about what had happened there of significance to the selection of the jury. *See Kentucky v. Stincer*, 482 U.S. 730, 745 (1987) (explaining that a defendant has a right to be present during any stage of a criminal proceeding if his presence "has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge" (citation and internal quotation marks omitted)). Accordingly, we cannot say that "[trial] counsel's assistance was reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688. Rather, Martinez-Castellanos has persuaded us that "the identified acts or omissions [by his trial counsel] were outside the wide range of professionally competent assistance." *See id.* at 690.

¶49    To prevail on an ineffective assistance of counsel claim, however, a defendant must also demonstrate prejudice resulting from deficient performance of counsel. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial

process that the trial cannot be relied on as having produced a just result." *Id.* at 686. In other words, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

¶50    Here, the service of Juror One, Juror Two, and Juror Six raises concerns. The State charged Martinez-Castellanos with several offenses, including two felony offenses for possession of methamphetamine and hydrocodone. Martinez-Castellanos denied possession of those items. He testified that he purchased the car prior to making the trip to Utah, that the car was already cluttered with items when he purchased it, and that he did not have time to clean it. Whether Martinez-Castellanos actually possessed the methamphetamine and hydrocodone in the car was therefore a central issue for the jury. Juror One had been involved in decades of highway patrol work involving just the sort of case he would decide as a juror, and he had previously worked with the State's only witness. Juror Six had raised questions about her state of mind and ability to serve as a juror when she indicated that she was reluctant to disclose what was going on in her own mind and that concern was more exacerbated than dispelled by her response that she had reservations about her ability to function as a juror, but that she understood what the judge wanted and believed she could serve as a juror. And Juror Two revealed a strong indication of bias related to the case against Martinez-Castellanos when she indicated that she thought that, if a person had drugs in the car, that person was probably guilty.

¶51    Despite the obvious questions about the impartiality of these three jurors, it is difficult to know with any confidence how trial counsel's failure to include Martinez-Castellanos in the jury selection process actually affected the trial. Martinez-Castellanos might have had much to add to the process of jury selection through his observations and impressions of individual

jurors or he might have said nothing of any substance. One or more of the three prospective jurors who raise concerns might have been eliminated, at least by peremptory challenge, or none of them, depending on the interplay of Martinez-Castellanos' own impressions and trial counsel's judgment and experience-based advice. But that is the precise problem with an omission like this—while the failure to have the defendant present during crucial voir dire or to consult with him at all during jury selection is troubling, it is difficult, if not impossible, to identify a resulting harm with any precision, unless it can be concluded that a biased juror actually sat. *See State v. King*, 2008 UT 54, ¶ 28, 190 P.3d 1283 ("A defendant who is convicted of a crime by a jury comprised of even one member who has exhibited actual bias is entitled to a new trial." (citing *United States v. Martinez-Salazar*, 528 U.S. 304, 316 (2000))).

¶52   The State contends that concluding Martinez-Castellanos was prejudiced is legally elusive in this case due to presumptions that apply to the adequacy of the record and to counsel's decision-making during jury selection: "[T]he record does not rebut the presumption that [trial counsel] adequately advised [Martinez-Castellanos] of his right to participate in the in-chambers questioning and that [Martinez-Castellanos] waived that right. Nor does it rebut the strong presumption that [trial counsel]'s jury selection decisions were strategic."

¶53   Certainly "[t]he simple fact that a potential juror may have ties to law enforcement" or may have a family member who "has been the victim of a similar crime" does not unequivocally establish bias. *State v. Alfatlawi*, 2006 UT App 511, ¶ 22, 153 P.3d 804. But Juror One's decades-long experience in exactly the type of traffic stop and investigation that occurred here, together with his professional association with the State's only witness, raise significant questions about partiality, as does Juror Two's statement that she thought a person found with drugs in his car (as was Martinez-Castellanos) was probably guilty. And Juror Six's reluctance to disclose her mental state in

the face of her reservations about her ability to function as a juror, while not directly indicating bias, nonetheless raises serious concerns. Court and counsel are required to follow up on such concerns with further questions, *see State v. Wach*, 2001 UT 35, ¶ 29, 24 P.3d 948 (explaining that when, "a question of potential bias arises," then "the court or counsel must investigate further to determine if the juror can be impartial"), but the reconstructed record describes no follow-up at all, other than a statement that the trial court asked each voir dire member questioned in chambers if he or she could be fair and impartial, presumably followed by an affirmative response, *cf. State v. Hewitt*, 689 P.2d 22, 26 (Utah 1984) ("A statement made by a prospective juror that he intends to be fair and impartial loses its meaning in light of other testimony or facts that suggest a bias.").

¶54 On the face of the reconstructed record of the in-chambers voir dire, it is difficult to understand why trial counsel failed to challenge any of the three jurors for cause or at least eliminate them from the jury through peremptory challenges.[10] But, as the State points out, "[i]n the absence of an adequate record on appeal, this [c]ourt can only assume the regularity of the

---

10. In his affidavit, trial counsel recalled that he did not object to Juror One serving on the jury "because he had been a supervisor on highway patrol when I was a district attorney for Juab County. I knew he had done a lot of work on freeway stops and I thought he would hear the evidence of how this stop occurred and know that it was not proper." But the legality of the traffic stop was not a question for the jury and, in any event, counsel apparently did not share this information with Martinez-Castellanos, who may have had a very different view of Juror One's suitability as a jury member in his case. And the trial court had sufficient concern about Juror One's service as a juror that the court raised the issue sua sponte, albeit after trial.

proceedings below." *State v. Wetzel*, 868 P.2d 64, 67 (Utah 1993); *see also State v. Pritchett*, 2003 UT 24, ¶ 13, 69 P.3d 1278 ("When crucial matters are not included in the record, the missing portions are presumed to support the action of the trial court." (citation and internal quotation marks omitted)). Further, "[w]here the record appears inadequate in any fashion, ambiguities or deficiencies resulting therefrom simply will be construed in favor of a finding that counsel performed effectively." *State v. Litherland*, 2000 UT 76, ¶ 17, 12 P.3d 92.[11] Consequently, we must assume that "the court or counsel" made an effective effort "to determine if the juror can be impartial despite the past experience." *Wach*, 2001 UT 35, ¶ 29.

¶55 Yet another presumption applies to the ultimate choices made by counsel during jury selection, which focuses ostensibly on counsel's performance but ultimately suggests the difficulty

---

11. We have recognized that "the district court shares in the responsibility to ensure that an adequate record is made." *State v. Prawitt*, 2011 UT App 261, ¶ 8, 262 P.3d 1203. "However, the ultimate burden is on a defendant to make certain that the record he compiles will adequately preserve his arguments for review." *Id.* (citation and internal quotation marks omitted). As a consequence, these presumptions apply even if the trial court was originally responsible for the inadequacy of the record. *See, e.g.*, *State v. Pritchett*, 2003 UT 24, ¶ 13, 69 P.3d 1278 (recognizing that there was no record of a bench conference prior to the trial court's "overruling of defense counsel's objections," but that "when an appellant fails to provide an adequate record on appeal, [the appellate court will] presume the regularity of the proceedings below"); *State v. Wetzel*, 868 P.2d 64, 67 (Utah 1993) (explaining that in absence of record of how defendant used peremptory challenges to remove jurors challenged on appeal, the appellate court "can only assume the regularity of the proceedings below").

of identifying prejudice arising from a jury selection decision. *Cf. Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (plurality opinion) ("Despite its importance, the adequacy of voir dire is not easily subject to appellate review."). "[T]he selection of a jury is inevitably a call upon experience and intuition. The trial lawyer must draw upon his own insights and empathetic abilities. Written records give us only shadows for measuring the quality of such efforts." *State v. Cosey*, 873 P.2d 1177, 1179 (Utah Ct. App. 1994) (citation and internal quotation marks omitted). Our supreme court has stated that applying the *Strickland* presumptions favoring competent representation during jury selection—i.e., that counsel did no harm in jury selection—is "appropriate . . . in large part because jury selection is more art than science," *Litherland*, 2000 UT 76, ¶ 21, where attorneys may "act[] on their own intuitions," *id.* ¶ 23, making decisions about prospective jurors that "may even appear counterintuitive . . . when viewed from the perspective of a bare transcript on appeal," *id.* ¶ 22. This is because "[t]here are a multitude of inherently subjective factors typically constituting the sum and substance of an attorney's judgments about prospective jurors," including subjectively evaluating a prospective juror's "demeanor, interaction with others in the courtroom, and personality." *Id.* ¶ 21. Therefore, "it follows that the decision not to remove a particular juror need only be plausibly justifiable, and such plausible justifiability is ordinarily presumed." *Id.* ¶ 25. But when there is not even a bare transcript, and the regularity of proceedings must be assumed, the task of overcoming the presumptions attendant on counsel's decisions in selecting a jury becomes nearly impossible. *Cf. State v. Tennyson*, 850 P.2d 461, 467 (Utah Ct. App. 1993) ("[O]ur review of counsel's performance in the present case is inherently hampered by our necessary reliance on only the lifeless transcript to assess the dynamic and highly judgmental process of jury selection.").

¶56    As a natural consequence of these presumptions, the question of whether counsel provided ineffective assistance of counsel during jury selection is narrowly focused:

> The defendant may rebut the presumption [of effective assistance of counsel in jury selection] by showing: (1) that defense counsel was so inattentive or indifferent during the jury selection process that the failure to remove a prospective juror was not the product of a conscious choice or preference; (2) that a prospective juror expressed bias so strong or unequivocal that no plausible countervailing subjective preference could justify failure to remove that juror; or (3) that there is some other specific evidence clearly demonstrating that counsel's choice was not plausibly justifiable.

*Litherland*, 2000 UT 76, ¶ 25 (footnote omitted).

¶57    The sparse record here, and the presumptions attendant on the inadequacy of that record, do not permit us to conclude that trial counsel was "inattentive or indifferent during the jury selection process." *See id. Litherland*'s second consideration focuses on the result, essentially asking whether an actually biased juror sat in judgment. *See id.*; *see also State v. King*, 2008 UT 54, ¶ 47, 190 P.3d 1283 (concluding that a defendant "must show that his counsel's actions prejudiced him because those actions allowed the seating of an actually biased juror").

¶58    Although there are serious questions regarding the impartiality of three of the jurors, the applicable presumptions—favoring the regularity of proceedings in the face of an inadequate record and supporting the wisdom of counsel's jury selection decisions—mean that we must assume that, despite the paucity of the reconstructed record of the in-chambers voir dire, further questioning of the three jurors whose voir dire statements raised concern adequately dispelled any questions

about their ability to be impartial in this case. In other words, the limited record in this case permits no more than speculation that a juror with actual bias may have sat in judgment. And, as the State contends, that is not enough. Nor, for essentially the same reasons, is there "specific evidence clearly demonstrating that counsel's choice" of jurors "was not plausibly justifiable." *Litherland*, 2000 UT 76, ¶ 25.

¶59 Nevertheless, what the reconstructed record includes and leaves out still raises concerns about juror impartiality that remain unresolved factually, if not legally. In particular, no one involved in reconstructing the record mentioned any attempt to clarify the three jurors' troubling responses other than the judge's simple query whether the juror "could be fair and impartial." As we have discussed, the presumptions about counsel's decisions in jury selection and in favor of the regularity of proceedings and effective performance by counsel in the face of an insufficient record support a conclusion that the court and counsel followed up appropriately with the three jurors and resolved any questions about their ability to sit in judgment in this case. *State v. Theison*, 709 P.2d 307, 309 (Utah 1985) (per curiam) ("When crucial matters are not included in the record, the missing portions are presumed to support the action of the trial court. Therefore, we presume the trial court acted correctly . . . ." (citations omitted)); *see also State v. Tunzi*, 2000 UT 38, ¶ 3, 998 P.2d 816 (recognizing that "attempts to reconstruct major portions of records often prove to be futile because such reconstructions often fail to provide the detail necessary to resolve the issues on appeal").

¶60 But while such presumptions may support a theoretical conclusion that no harm resulted from this process—that no biased juror was actually seated—it is a particularly unsatisfactory result where the foundation for that conclusion is one presumption layered on another and where the trial judge himself had lingering concerns about at least one of the three jurors, which caused him to sua sponte raise the issue after trial.

And it is all the more troubling when the crucial events occurred without Martinez-Castellanos' involvement, the person most interested in the effective functioning of the jury selection process. *See Faretta v. California*, 422 U.S. 806, 819–20 (1975) ("The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails."). Nevertheless we reluctantly conclude that, on this record, Martinez-Castellanos cannot show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

## II. The Motion to Suppress

¶61    Martinez-Castellanos next argues that he "was deprived of the effective assistance of counsel when [trial counsel] failed to file a proper motion to suppress evidence seized during an unlawfully extended traffic stop." Martinez-Castellanos asserts that, because trial counsel "was ineffective for failing to make proper and meritorious arguments to suppress the evidence," his counsel's "deficient performance resulted in prejudice because there [was] a reasonable likelihood that the district court would have given the issue proper consideration in Martinez-Castellanos' favor if counsel had presented the arguments." As we have discussed, to demonstrate ineffective assistance of counsel Martinez-Castellanos must meet both Strickland elements—deficient performance of counsel and prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

¶62    Normally, when failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, "the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986). But we conclude that the representation of Martinez-Castellanos in connection with the

motion to suppress was so deficient that he was effectively unrepresented during this important phase of district court proceedings, leaving us with little confidence in the outcome. *Cf. Strickland*, 466 U.S. at 686 (describing the "benchmark" of an ineffective assistance of counsel claim as "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result").

¶63   It is a "bedrock principle that a competent criminal defense lawyer must put the prosecution to its proof" and therefore has a "duty to be a zealous advocate." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 353 (2009). The United States Supreme Court has stated,

> The adversarial process protected by the Sixth Amendment requires that the accused have counsel acting in the role of an advocate. The right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing. When a true adversarial criminal trial has been conducted[,] the kind of testing envisioned by the Sixth Amendment has occurred. But if the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated.

*Id.* (alteration, ellipsis, citations, and internal quotation marks omitted). Here, the proceedings surrounding the motion to suppress did not amount to an effective adversarial process.

¶64   It is clear from the record that trial counsel failed to make any argument in support of the motion to suppress. Trial counsel filed a motion to suppress but did not submit a memorandum supporting his position. And even after requesting and receiving several continuances—extending over

a three-month period—to enable him to "submit a brief on the matter," counsel ultimately failed to file any supporting memorandum at all. The prosecution finally submitted its own memorandum opposing the motion, but trial counsel filed no response advocating Martinez-Castellanos' position, so the prosecution's arguments went unanswered. Having heard nothing from trial counsel after multiple continuances, the district court eventually denied the motion to suppress without the benefit of any legal or factual argument on Martinez-Castellanos' behalf.

¶65    Trial counsel then moved to set aside that order and again asked for more time to file a supporting memorandum. The court granted the motion and set aside its order. But, again, trial counsel failed to submit a supporting memorandum. At the time of trial and after trial, counsel filed additional motions asking the court to suppress the evidence from the traffic stop, also without supporting memoranda, simply claiming in conclusory fashion that testimony from the trial warranted the court's reconsideration. The prosecution opposed the motions as untimely and deficient under the Rules of Criminal Procedure, and the trial court denied them, just as it had the original motion to suppress. The court took notice of these glaring inactions by trial counsel, stating,

> [T]he court may not have had sufficient information prior to trial, and now having gone through the trial and understanding what the evidence is[,] could see that there was a kernel of a concern. There was some level of concern that had it been followed up with earlier, may have had a significant outcome on the case.

These concerns led to the court's "sua sponte consideration of granting defendant a new trial." *See* Utah R. Crim. P. 24(a).

¶66   Thus, while trial counsel managed to identify a legitimate issue and draw it to the court's attention, he failed to follow through and "put the prosecution to its proof," thereby failing to fulfill the most basic and essential duty of competent counsel—to use his experience, training, and expertise to advocate his client's position in a crucial aspect of the defense. *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 353 (2009) (recognizing that the Sixth Amendment "require[s] the prosecution's case to survive the crucible of meaningful adversarial testing" (citation and internal quotation marks omitted)); *Strickland v. Washington*, 466 U.S. 668, 688 (1984) (stating that counsel has a duty "to bring to bear such skill and knowledge as will render the trial a reliable adversarial process").

¶67   That counsel recognized the suppression issue was important is demonstrated by his repeated efforts, unfocused and unsustained though they were, to get the motion before the court. And his repeated requests for additional time to brief the issue showed that he understood the importance to his client of his role as a professional advocate. But counsel abdicated that role by never filing any analytical support for the motion to suppress. The trial court clearly recognized the problem in its sua sponte motion for a new trial, which expressed concern not only about aspects of the jury selection, but also recognized that Martinez-Castellanos may have been ineffectively represented in connection with the suppression motion. The court's concern manifested in its decision to appoint conflict counsel to represent Martinez-Castellanos in post-trial proceedings focused on trial counsel's "failure to file any memorandum following an evidentiary hearing on [Martinez-Castellanos'] motion to suppress." It is abundantly clear that the "acts or omissions" of trial counsel "were outside the wide range of professionally competent assistance" and therefore amounted to deficient performance. *See Strickland*, 466 U.S. at 690.

¶68   The trial court recognized the deficiency in trial counsel's performance regarding the motion to suppress and sought to

address it by its sua sponte post-trial motion and subsequent appointment of conflict counsel to represent Martinez-Castellanos. Martinez-Castellanos argues, however, that in connection with this appointment the trial court erred by "failing to ensure that [he] had the effective assistance of counsel at all stages of the proceedings, including during post-trial proceedings." Because Martinez-Castellanos did not preserve this argument, he seeks review under the plain error doctrine. *State v. Floyd*, 2014 UT App 53, ¶ 6, 321 P.3d 1170 ("Appellate courts generally will not consider an issue raised for the first time on appeal absent plain error, exceptional circumstances, or ineffective assistance of counsel."). To succeed on a claim of plain error, a defendant must establish that "(i) [a]n error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful." *State v. Dunn*, 850 P.2d 1201, 1208 (Utah 1993).

¶69　Martinez-Castellanos contends that, "[w]hile the court should be commended for its part in recognizing and calling for post-trial proceedings to address ineffective assistance, it erred when it failed to appoint conflict counsel to represent [him] in a meaningful way." Rather, "the court simply appointed an attorney as amicus to address one distinct issue for the court." After trial, the district court sua sponte raised two issues of possible ineffective representation by trial counsel. One involved a particular juror, as we have discussed above, and the other was trial counsel's failure to "file any memorandum following an evidentiary hearing on defendant's motion to suppress." The court "appoint[ed] conflict counsel for purposes of [its] sua sponte motion" to assess ineffective assistance of counsel regarding whether the trooper had any justification for extending the stop. The court noted that it had a "kernel of a concern" that trial counsel failed to follow up with proper suppression arguments that "may have had a significant outcome on the case."

¶70    Conflict counsel filed what he titled an "Amicus Brief." In his brief, conflict counsel stated that the issue was: "Whether Defendant's failure to file a legal memorandum in support of his Motion to Suppress rises to the level of ineffective assistance of counsel." The brief explained that trial counsel's failure to file a memorandum supporting the motion to suppress was not prejudicial because, once counsel moved to suppress, the prosecution bore the burden to prove that the search was lawful. Conflict counsel further noted that the district court denied the suppression motion on the merits, not merely because trial counsel failed to file a supporting memorandum:

> It stand[s] to reason . . . that [trial counsel's] failure to file a legal memorandum could [not] satisfy the second prong of the *Strickland* test[,] . . . because implicit in the Court's denial of [the] Motion to Suppress, with or without legal memorandum, is a finding and conclusion of law that the State met its burden in establishing that the evidence was obtained legally.

After receiving conflict counsel's Amicus Brief, the district court withdrew its sua sponte notice regarding the ineffective assistance of counsel issues. The court went on to explain that, although it was initially concerned with trial counsel's "failure to file a memorandum" supporting the suppression motion, it was satisfied that the lack of a memorandum did not amount to ineffective assistance of counsel for the reasons conflict counsel provided.

¶71    It is apparent that, although the trial court purported to appoint conflict counsel to represent Martinez-Castellanos in post-trial proceedings regarding the motion to suppress, conflict counsel did no such thing. Rather than advocating on Martinez-Castellanos' behalf, conflict counsel merely sought to reassure the court of the legitimacy of its decision to deny the motion to suppress. Conflict counsel asserted that trial counsel's failure to

brief the suppression issue could not meet the *Strickland* standard for ineffective assistance because no harm resulted. Conflict counsel based this conclusion on the circular reasoning that once the motion was filed, the burden shifted to the State to prove that the evidence was legally obtained, and the trial court had already decided that the State had met that burden when it decided the issue in the State's favor on the merits. In other words, because the court had decided the motion against the Martinez-Castellanos, it must have lacked merit in the first place and, as a consequence, trial counsel's failure to file a memorandum arguing Martinez-Castellanos' position was harmless.

¶72   While this argument is logically flawed because it appears to assume the conclusion as a premise, the real problem is that, while ostensibly appointed as counsel in the place of Martinez-Castellanos' trial counsel, conflict counsel did not represent Martinez-Castellanos at all. Rather, he acted as a self-appointed amicus curiae—a friend of the court—and took a position contrary to his client's interest in reassuring the court that its decision to deny the motion to suppress was correct. As a result, Martinez-Castellanos was not only without representation at this stage of the proceedings, his appointed attorney also worked against him.

¶73   A defendant is entitled to be represented at all stages of trial by conflict-free counsel who zealously advocates in his or her client's interest. *See Webster v. Jones*, 587 P.2d 528, 530 (Utah 1978) ("[W]here a person is charged with an offense which may be punished by imprisonment, he is entitled to the assistance of counsel."). But rather than resolve a conflict of interest between Martinez-Castellanos and his trial counsel, the court's well-intentioned decision to appoint conflict counsel compounded the failure of representation that Martinez-Castellanos had experienced throughout the whole motion to suppress process. Indeed, once the trial court received the Amicus Brief that did not advocate for him, Martinez-Castellanos had been left

unrepresented during the post-trial process, just as he had been unrepresented as a practical matter during the suppression motion. Thus, Martinez-Castellanos has demonstrated that the trial court erred and that the error was obvious.

¶74 Ordinarily, Martinez-Castellanos would also need to "prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986). And on appeal, Martinez-Castellanos asserts that there is a "reasonable likelihood that a proper motion would have resulted in suppression of the evidence" because, under "the totality of the circumstances," there "is insufficient [evidence] to support reasonable suspicion for the extended detention."

> [The trooper] articulated two points for the extended detention [following the traffic stop]: Martinez-Castellanos' "rapid" manner and his 3-year-old criminal history. Notably, and over the course of the proceedings, the trooper changed his testimony as it related to those points. Specifically, the video of the traffic stop supports nothing unusual about Martinez-Castellanos' mannerisms and the trooper admitted that Martinez-Castellanos may have behaved his "normal way." Also, the 3-year-old history was stale.

¶75 Martinez-Castellanos asserts that "[i]f the district court had been allowed to assess those issues, there is a reasonable likelihood that the court would have made findings to support Martinez-Castellanos' motion to suppress the evidence, thereby leading to a different result." The State responds that "none of the additional arguments" advanced by Martinez-Castellanos on appeal "would have persuaded the trial court to grant a motion to suppress" because he "has not shown that [the trooper] lacked

a reasonable and articulable suspicion to briefly detain him to conduct field sobriety tests."

¶76   The arguments of both parties appear to have some merit, and we would ordinarily go on to resolve the issue based on the facts in the record. But the concerns we have raised about the representation that Martinez-Castellanos received during the motion to suppress—essentially the entire absence of representation—make us reluctant to resolve the issue here, particularly because it was so poorly developed in the trial court. Moreover, the merits of the issue do not so clearly favor either side that we are persuaded that additional proceedings with competent counsel actually representing Martinez-Castellanos could not have a material impact on the result. The trial court itself raised questions about the potential significance of the trooper's trial testimony on its earlier decision to deny the motion to suppress, and that question was never addressed on the merits below. Rather, Martinez-Castellanos was denied the effective assistance of counsel throughout the suppression motion process (and was not represented at all during the post-trial proceedings on the issue), with the result that a plausible motion to suppress, potentially affected by unexplored developments during the trial itself, was resolved against him in an essentially one-sided proceeding. In sum, there was no adversarial process during this portion of the trial.

## III. Cumulative Error

¶77   As *Strickland* acknowledges, the purpose of the effective assistance guarantee in the Sixth Amendment "is simply to ensure that criminal defendants receive a fair trial." *Strickland v. Washington*, 466 U.S. 668, 689 (1984). Thus, "the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." *Id.* at 696. Martinez-Castellanos has demonstrated that his trial counsel performed deficiently during jury selection and in the proceedings on the motion to suppress. In addition, he has shown that he was not

represented at all during the post-trial proceeding on the motion to suppress, where conflict counsel in effect advocated against him.

¶78　However, we have not been able to conclude that Martinez-Castellanos has demonstrated the necessary prejudice to be entitled to relief on the grounds of ineffective assistance of counsel or plain error. Nevertheless, we have expressed our deep concerns in this regard about the weakness of the foundation—based almost entirely on layered legal presumptions—for our determination that Martinez-Castellanos could not show harm from trial counsel's deficient performance in the jury selection context. *Cf. State v. Ison*, 2006 UT 26, ¶ 37, 135 P.3d 864 (explaining that it places "too much strain on the interests of justice" to presume "both that a record of the events surrounding the jury question exists *and* that [the defendant's] failure to include this portion of the record on appeal requires [the court] to infer that no error occurred"). We have expressed serious concerns, as well, about what essentially amounts to a denial of counsel in the connection with the motion to suppress and our consequent reluctance to resolve the suppression issue without further proceedings in the trial court.

¶79　As a result of the "cumulative effect of the several errors," our confidence that Martinez-Castellanos received a fair trial is seriously undermined. *Cf. State v. Dunn*, 850 P.2d 1201, 1229 (Utah 1993) ("Under the cumulative error doctrine, we will reverse only if the cumulative effect of the several errors undermines our confidence . . . that a fair trial was had." (omission in original) (citation and internal quotation marks omitted)). "Cumulative error refers to a number of errors which prejudice a defendant's right to a fair trial." *State v. Ellis*, 748 P.2d 188, 191 (Utah 1987) (alteration, citation, and internal quotation marks omitted). "To evaluate a cumulative error claim, we consider all the identified errors, as well as any errors we assume may have occurred." *State v. Jones*, 2015 UT 19, ¶ 74, 345 P.3d 1195 (citation and internal quotation marks omitted). "But

[i]f the claims are found on appeal to not constitute error, or the errors are found to be so minor as to result in no harm, the doctrine will not be applied." *State v. Maestas*, 2012 UT 46, ¶ 363, 299 P.3d 892 (alteration in original) (citation and internal quotation marks omitted).

¶80 The errors that Martinez-Castellanos has identified on appeal with respect to his trial counsel's performance regarding voir dire, together with the serious deficits in representation in the suppression motion context, reinforce our concerns that Martinez-Castellanos did not have the assistance of counsel contemplated by the Sixth Amendment during important stages of the trial process in the district court. *Strickland*, 466 U.S. at 684 (recognizing "that the Sixth Amendment right to counsel exists, and is needed, in order to protect the fundamental right to a fair trial"). We recognize that "[i]n every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Id.* at 696. We believe that such a breakdown in the adversarial process happened here. When we consider together trial counsel's deficient performance during voir dire and his complete failure to offer any analytical support for the motion to suppress, the effective denial of counsel that occurred in post-trial proceedings, and the trial court's own concerns regarding juror bias and the suppression motion, our confidence that a fair trial occurred here is significantly shaken. *Cf. Dunn*, 850 P.2d at 1229. Although we have reluctantly concluded that no single error met the prejudice standard of ineffective assistance or plain error, when "we consider all the identified errors, as well as any errors we assume may have occurred," *id.*, our confidence in the fairness of the trial and its outcome is substantially undermined. *Cf. State v. Campos*, 2013 UT App 213, ¶¶ 61, 72, 309 P.3d 1160 (vacating the defendant's conviction based on the cumulative prejudicial effect of trial counsel's deficient performance).

CONCLUSION

¶81   Due to the cumulative effect of several errors, our confidence that Martinez-Castellanos received the assistance of counsel guaranteed by the Sixth Amendment to the United States Constitution is undermined. We reverse Martinez-Castellanos' convictions and remand the case to the trial court for a new trial with different counsel.

---

ORME, Judge (concurring in part and concurring in the result):

¶82   I readily concur in the judgment ultimately reached by my colleagues, that Martinez-Castellanos is entitled to "a new trial with different counsel" and an impartial jury. And I concur in much of what is said in the lead opinion. But the path I take to the correct result is much more direct and much less guarded than that preferred by my colleagues. When our ordinary presumptions and deferential approach are set to one side, as they should be in this extraordinary case, it is clear that a serious miscarriage of justice occurred here. And notions of judicial restraint and deference should not keep us from saying so.

¶83   I have three main areas of disagreement with the lead opinion. The first one is fairly basic. As explained in the lead opinion, no record was made of the interviews conducted in chambers with several of the prospective jurors. Had that gap remained, it would be appropriate to presume the regularity of the proceedings of which there was no record and indulge the presumption that appropriate questions were asked of the jurors and proper objections raised, discussed, and ruled upon. But there is no occasion to employ that fiction here. We have a record of the in-chambers proceedings, albeit one that was reconstructed in accordance with rule 11(h) of the Utah Rules of Appellate Procedure rather than a verbatim one made via court

reporter or a recording.[12] By the express terms of that rule, the record of that proceeding, as reconstructed by the parties on appeal, "conform[s] to the truth," and we should treat it like any other part of the record. Utah R. App. P. 11(h). Accordingly, the fact that the supplemental record does not reveal incisive follow-up questions does not mean that they might have been asked; it means that they were not. Likewise, the fact that the reconstructed record includes no hint of challenges for cause does not mean that they might have been made; it means that they were not.

¶84    Thus, I do not share my colleagues' mystification about what happened in chambers. For purposes of this appeal, we

---

12. Rule 11(h) provides as follows:

> (h) *Correction or modification of the record*. If any difference arises as to whether the record truly discloses what occurred in the trial court, the difference shall be submitted to and settled by that court *and the record made to conform to the truth*. If anything material to either party is misstated or is omitted from the record by error, by accident, or because the appellant did not order a transcript of proceedings that the appellee needs to respond to issues raised in the Brief of Appellant, the parties by stipulation, the trial court, or the appellate court, either before or after the record is transmitted, may direct that the omission or misstatement be corrected and if necessary that a supplemental record be certified and transmitted. The moving party, or the court if it is acting on its own initiative, shall serve on the parties a statement of the proposed changes. Within 10 days after service, any party may serve objections to the proposed changes. All other questions as to the form and content of the record shall be presented to the appellate court.

Utah R. App. P. 11(h) (emphasis added).

know what happened in chambers. Contrary to the tack taken in paragraphs 12 and 13 of the lead opinion, it is clear from our record, reconstructed to conform to the truth though it may be, that no "specific concerns were raised about any particular venire member" and that none "were actually challenged for cause. Astonishingly, this is true even with respect to Juror One—more about him later—a retired veteran of the Utah Highway Patrol who knew the arresting trooper in this case and who had himself made many—*very* many—traffic stops and drug arrests like the one involved in this case, along the same stretch of highway in the same county.

¶85    Second, this is not a case for application of the usual presumption that defense counsel performed diligently and that any decisions made in the course of preparation and trial were a function of competent performance and sound tactics on his part. Counsel's failure to meet his briefing obligations and otherwise pursue the motion to suppress, especially with the many extensions and opportunities he was given, is inexcusable.[13] His failure to include his client in the jury selection process in any meaningful way is likewise inexcusable, but his failure to at least let his client know that Juror One, destined to become the jury foreperson, was a longtime veteran of the Highway Patrol who had made it his life's mission to catch drug runners in Juab County was nothing short of unprofessional. And counsel's explanation that he was anxious to have Juror One remain on the jury because he figured that, with Juror One's extensive

---

13. Defense counsel's cavalier approach to his briefing obligations in this case is not aberrational. On the contrary, as the result of a history of ignoring his briefing obligations, he was previously barred from practice before the appellate courts of this state for a period of three years. *See State v. Smith*, 2010 UT App 231, ¶¶ 5–6, 238 P.3d 1103 (per curiam).

background in making similar stops, he would know this one was illegal, is ridiculous, as is more fully explained below.

¶86    My third concern focuses on Juror One, who is none other than the legendary Sergeant Paul Mangelson. It is impossible to understand the magnitude of the problem with his selection as a juror in this case without knowing his identity. The parties on appeal recognize this, and in their briefs, which are matters of public record, they freely disclose his identity as they debate the propriety of his serving on the jury. And no effort was made in the proceedings below to hide his identity, which was understood to be of pivotal concern. Thus, the effort of my colleagues to preserve juror anonymity, usually entirely appropriate, is misguided in this case. As counsel and the trial court perceived, the propriety of Juror One sitting on this jury cannot be properly evaluated without knowing who Juror One is.

¶87    To be clear, the formidable Sergeant Mangelson was a very effective warrior on the Utah front of the war on drugs. *See* Donald J. Eyre, *"Max 25" is Retiring—the End of an Era in Utah Law Enforcement*, 19 Utah Bar J. 33 (July/Aug. 2006), https://www.utahbar.org/wp-content/uploads/2014/10/2006_july_aug.pdf . He was involved in at least thirty-three cases, *see id.* at 35, and who knows how many stops that never resulted in an arrest, *see, e.g.*, Ted Cilwick, *ACLU Suit Says 2 Troopers Stop Hispanic Repeatedly*, Salt Lake Tribune, June 12, 1993, at B3 (reporting that Sergeant Mangelson and another officer allegedly pulled a man over on a stretch of I-15 between West Valley City and Las Vegas seven times between 1990 and 1993, resulting in only one warning citation and one nonconsensual search of the man's vehicle); that never went to trial; or that never went up on appeal.

¶88    But contrary to defense counsel's expressed view, Sergeant Mangelson was not necessarily an expert on the Fourth Amendment or well versed in its requirements. *See* Ted Cilwick, *"Super Cop" Boon or Bust to Drug Fight? "Super Cop" Is Boon to Drug Fight, but May Be Constitutional Bust*, Salt Lake Tribune,

May 3, 1992, at A1 (quoting Sergeant Mangelson as stating the following justification for his tactics: "The judges are blind to what goes on out here . . . . Should we sit here and do nothing? The majority of people are behind us. They want us to keep hammering them. If it was up to a lot of people, they'd have us search all of them."). And there was no basis in fact for defense counsel's expressed belief that Sergeant Mangelson would make an excellent juror because of his ability to distinguish between legal stops and illegal ones. Indeed, many of his stops were determined to be illegal. *See United States v. Wald*, 216 F.3d 1222, 1224, 1229 (10th Cir. 2000) (holding search of defendant's trunk, after Sergeant Mangelson pulled him over for a badly cracked windshield, was unconstitutional because there was no consent or probable cause for the search); *United States v. Fernandez*, 18 F.3d 875–76, 880 (10th Cir. 1994) (concluding detention of defendant after a lawful stop, where Sergeant Mangelson responded as back-up, was illegal because the defendant was detained beyond the time necessary to issue the traffic citation upon which the stop was premised); *United States v. Lyons*, 7 F.3d 973, 976 (10th Cir. 1993) (concluding that stop of defendant to assess whether his weaving between lanes was due to impairment was illegal because, as Sergeant Mangelson testified, he relied on a "sixth sense" to determine whether defendant was impaired and cited only a "withdrawn look" in his eyes as evidence of said impairment), *overruled by United States v. Botero-Ospina*, 71 F.3d 783, 786–87 (10th Cir. 1995) (rejecting the pretext stop doctrine upon which *Lyons* was based); *United States v. Farias*, 43 F. Supp. 2d 1276, 1282–85 (D. Utah 1999) (concluding detention of defendant after a lawful stop was illegal because Sergeant Mangelson kept defendant longer than necessary while asking questions unrelated to the alleged reason for the stop in pursuit of "a hunch"); *Sims v. Tax Comm'n*, 841 P.2d 6, 8–9 (Utah 1992) (concluding that a roadblock stop "planned and supervised" by Sergeant Mangelson, *State v. Sims*, 808 P.2d 141, 142 (Utah Ct. App. 1991); *see Sims v. Tax Comm'n*, 841 P.2d at 8 n.1, "was unconstitutional under the Utah Constitution" because the

roadblock was not authorized by statute or based on an "articulable, individualized suspicion of wrongdoing" but was planned in advance by Sergeant Mangelson, without exigent circumstances, for investigatory purposes); *State v. Park*, 810 P.2d 456, 456–57, 459 (Utah Ct. App. 1991) (per curiam) (concluding a roadblock stop made by Sergeant Mangelson violated the Fourth Amendment when the stop was used to pressure defendant for consent to search the vehicle, and suppressing marijuana confiscated in a subsequent search); *State v. Kitchen*, 808 P.2d 1127, 1130–31 (Utah Ct. App. 1991) (concluding a roadblock stop violated the Fourth Amendment when there was no evidence the roadblock advanced the public interest and when Sergeant Mangelson, rather than a neutral body, planned it and also carried it out, based on guidelines only for the particular roadblock in question, and absent guidelines to "prevent arbitrary invasions" of the drivers' rights) (citation and internal quotation marks omitted); *State v. Arroyo*, 770 P.2d 153, 155 (Utah Ct. App. 1989) (concluding Sergeant Mangelson's stop of defendant for following too closely was illegal because it was pretext for a drug search), *rev'd on other grounds*, 796 P.2d 684, 692 (Utah 1990); *State v. Baird*, 763 P.2d 1214, 1217 (Utah Ct. App. 1988) (concluding that Sergeant Mangelson had no reasonable articulable suspicion to stop a vehicle that was driving within the speed limit when he stopped the car because "'something just struck me funny about it'").

¶89   In a case like this one, Sergeant Mangelson's impartiality could, to put it mildly, be reasonably questioned, and it was inexcusable for defense counsel not to have moved that Sergeant Mangelson be excused for cause, a motion that would have been granted without the trial judge batting an eye. Indeed, extraordinary though it is, I would go so far as to say that the trial court plainly erred in not striking Sergeant Mangelson from the venire on its own motion, if it came to that, so obvious was his unsuitability to serve on the jury in this case.

¶90    On the record before us, defense counsel's dereliction of duty violated his client's Sixth  Amendment right to the effective assistance of counsel. Sergeant Mangelson had no business  being on the jury that convicted Martinez-Castellanos. The prejudice in this case is so palpable on both scores that Martinez-Castellanos's entitlement to a new trial is in no sense a close question.

————————

ROTH, Judge (response to the concurrence):

¶91    I write separately to make two points in response to Judge Orme's concurrence. First, the concurrence as I understand it reads rule 11 to mean that a reconstructed record is the same as any other record on appeal because the reconstruction is "made to conform to the truth." Utah R. App. P. 11(h). Under that interpretation, anything not portrayed in the reconstructed record in effect did not take place, which drastically reduces the analysis required to dispose of this case. However, I do not believe the absence of certain details in the reconstructed record can be taken as proof of their absence from the actual proceeding or that their absence precludes us from making inferences—in the form of presumptions—that certain things occurred below which were not specifically included in the reconstruction.

¶92    Utah law recognizes that records are not always perfectly complete, and it does not require them to be. *E.g.*, *State v. Gardner*, 2007 UT 70, ¶ 26, 167 P.3d 1074 (affirming this court's determination that a record with testimonial gaps was nonetheless complete enough to answer the question presented). Thus, a record sufficient to afford meaningful review need not always be a complete record, and this is true regardless of whether the record is reconstructed or not. One way to conceptualize this situation is to place all records on appeal along a scale from nonexistent at worst to complete at best. Obviously, any record approaching the nonexistent side of the spectrum cannot sustain an appeal. However, a record sufficient

for appeal might still contain gaps that prevent it from being perfectly complete. *See id.* This reality drives the presumptions of regularity of proceedings and competent performance of counsel discussed in the opinion of the court; the presumptions exist precisely to help appellate courts fill the gaps left by imperfect—yet sufficient—records. And a record reconstructed under rule 11(h), though "made to conform to the truth," is not thereby rendered complete.

¶93   The reconstructed record at issue clearly falls somewhere between complete and wholly insufficient. Reading through it cannot fail to raise many questions about what may—or even must—have happened during voir dire that is not recounted. In fact, the record reconstruction does not even purport to be complete. The entirety of the reconstruction consists of the memories of two attorneys recounted roughly fifteen months after the trial, and the fog of time is apparent.

¶94   In their affidavits, both attorneys routinely reverse engineer their recollections from known facts. For instance, when recounting the voir dire of Juror One, trial counsel stated, "I do not remember any specific questions or answers, but [the trooper] *would have* assured us that he knew how to be fair, and that he could be fair, if selected as a juror." (Emphasis added.) Thus, in his reconstruction effort defense counsel took a known fact—that Juror One was eventually seated on the jury—and worked backward to conclude that Juror One must have dispelled any concerns of bias during questioning, otherwise he would not have been empaneled. Although the circularity of the reasoning is obvious, this statement is taken as the truth under the terms of rule 11, and no one contests that point. But without Juror One's actual answers and the questions that elicited them, the record is incomplete and calls for gap filling. Here, filling the gap required tracking through several layers of judicial presumption as explained in the court's opinion—the very circumstance the presumptions seem designed to address. For these reasons I cannot agree with the concurrence's conclusion

that, if the certain acts were not made part of the reconstructed record, then those acts did not take place.

¶95    Second, I believe the concurrence's analytical approach, though intended as a more efficient way to reach a just result in this case, bypasses some important principles. For instance, the concurrence draws on defense counsel's prior professional transgressions to support a conclusion that he acted similarly in this case; counsel has performed ineffectively in the past, so it is likely that he did so again. Specifically, the concurrence suggests that a history of deficient performance overcomes the presumption of competency that would otherwise apply.

¶96    There is some appeal to such an approach because the appellate process plays an important role in protecting defendants from paying the high price of ineffective counsel. However great the temptation, though, I am concerned that the concurrence undermines an important principle that generally prevents character evidence from being used this way. I do not think it wise to apply what is essentially a character analysis based on prior occurrences to arrive at conclusions of ineffective performance under the circumstances of a particular case; rather, such an exercise seems better suited to the confines of an adversarial disciplinary process. I also have concerns about the future effects of suggesting that defendants can bolster their ineffective assistance of counsel claims on appeal by scouring case reporters (or other sources) for an attorney's prior mistakes.

¶97    In addition, I am concerned about the use of extra-record facts in the discussion of Juror One. The concurrence takes apparent judicial notice of information far beyond the record on appeal. For instance, the concurrence collects cases in which Juror One, in his professional capacity as a highway trooper, made many traffic stops that state and federal appellate courts eventually ruled unconstitutional. The concurrence also cites newspaper and journal articles, the very definition of hearsay, documenting Juror One's professional career. Although such

extrinsic information may be relevant to the determinations of a trial court and counsel about whether a given juror is fair and impartial, I do not believe it is appropriate to the work of an appellate court for two reasons.

¶98    First, it is not clear that the broad judicial notice taken in the concurrence is appropriate at this stage of the process. This appeal focused on particular procedural problems in the trial below; it came to us on briefing, submitted by the parties, that relied on a single certified record. Enlarging the scope of the record sua sponte on appeal blurs the boundaries between trial courts and appellate courts and can work an unfairness on appellate parties and counsel. *See, e.g.*, *State v. Pliego*, 1999 UT 8, ¶ 7, 974 P.2d 279 ("An appellate court's review is limited to the evidence contained in the record on appeal." (ellipsis, citation and internal quotation marks omitted)). If this court, with time and resources not available to district courts or trial counsel during voir dire, looks outside the record in this way in even a small number of cases, it could affect the confidence of parties and lower courts in the regularity and predictability of our process, a process that is for good reason constrained in its approach to appellate review.

¶99    Second, even if Juror One was of such local stature that he and his professional work history were or should have been known to the trial court and counsel to the extent the concurrence suggests, the ultimate consequence of the concurrence's analysis is not simply that his background should have been taken into account (which it apparently was), but that Juror One would be categorically foreclosed from serving on a jury considering the sort of issues at play in this case. As a consequence, any judge that empaneled Juror One could be reversed for plain error and any decision by counsel to allow him as a juror would ipso facto amount to ineffective assistance. However, such a pronouncement from this court invades the purview of the voir dire process itself, which is designed to determine on a case-by-case basis if a given citizen can

effectively fulfill his obligation to serve. I do not think it wise to suggest here that a certain history, however concerning it may be on its face, amounts to a per se disqualification for jury service that cannot be justifiably overcome in the circumstances of a particular case. For these reasons, and with respect, I see this case as a much closer question than does the concurrence.

————